## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROCK RIDGE INSURANCE COMPANY** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 24-3861** |
| | : | |
| **SCOTT R. KRUKOWSKI,** *et al.* | : | |

**McHUGH, J.**                                                          **March 19, 2026**

### MEMORANDUM

This is an insurance coverage dispute in which the critical question is how far a policy of homeowners insurance extends beyond the home explicitly identified as the insured premises. The insureds under the policy have an adult son with mental health challenges that at times led to homelessness. To support him, they rented an apartment about two miles from their home which they furnished and visited with some regularity. Unfortunately, he set a fire that caused significant damage, and suit was brought against him and against his parents as signatories of the lease. They sought coverage from their homeowners carrier, Plaintiff Rock Ridge Insurance Company, contending that the apartment fell within their policy because they used it "in connection with" their home. Rock Ridge has been defending the underlying case but seeks a declaratory judgment relieving it of the obligation to defend or indemnify, arguing that the apartment is not an insured location as defined by the policy.

At the outset of this case, I denied motions to dismiss, concluding that Rock Ridge plausibly stated a claim. With discovery now complete, and the materiel facts not in dispute, the issue is one of law. Because I am persuaded that the insureds cannot be said to have used the apartment "in connection with" their home, and that it is not an "insured location" as defined by

the policy, there is no coverage for the underlying claims.  Rock Ridge's motion for summary

judgment must therefore be granted and the pending cross-motions denied.

## I.    Relevant Background

### A.  The Alleged Use of the Apartment

On January 27, 2021, Defendants Robert and Gayle Miller ("Millers") rented an apartment

at 26 South Street in Newtown, Pennsylvania.  Pl.'s Mot. Summ. J., Ex. D, ECF 51-5.  The lease

identified them as the tenants and stated that they were "leasing this apartment for their son, Scott

Krukowski, to occupy."  *Id.* at 7.  The Millers both testified at their depositions that they rented

the apartment solely to provide their then 34-year-old son, Defendant Scott Krukowski, who faced

significant mental health challenges and experienced periods of homelessness, with a sense of

independence while he completed a mental health treatment program nearby.  *See, e.g.*, R. Miller

Dep. at 33:4-19, ECF 51-7; G. Miller Dep. at 18:14-18, ECF 51-10.  Mrs. Miller explained that

this was "the whole purpose" of renting the apartment.  G. Miller Dep. at 61:14-19, ECF 51-10.

According to the Millers, it was important to them that the apartment was physically close

to their home so that they could easily check in on Krukowski, which they often did, *id.* at 67:24-

68:1-11, or Krukowski could stop by when he wanted to see them, which he frequently did, R.

Miller Dep. 11:12-12:3, ECF 51-9; G. Miller Dep. at 97:16-98:19, ECF 51-11.  The apartment was

roughly two miles from their home.  R. Miller Dep. at 11:12-12:3, ECF 51-9.  There is some

conflicting testimony about the frequency of the Millers' visits to the apartment, but it is evident

there were periods during Krukowski's occupancy when they visited him at least once per

week, and other periods when they visited him on multiple days during any given week.  *Compare*

G. Miller Dep. at 68:19-69:3, ECF 51-10 (agreeing with plaintiff's counsel that it was fair to say

they went at least once a week), *with* R. Miller Dep. at 22:5-13, ECF 51-9 (stating they would go "almost daily"), *and* G. Miller Dep. at 10:1-2, ECF 51-12 (stating Mrs. Miller would go "daily").

The Millers' visits to the apartment were relatively brief—some lasted for a few minutes, others for a few hours—before they returned home. Krukowski Dep. at 65:9-12, ECF 51-6; R. Miller Dep. at 62:4-8, ECF 51-7; G. Miller Dep. at 10:10-16, ECF 51-12. They never stayed overnight at the apartment nor stored any of their belongings there. R. Miller Dep. at 54:15-17, ECF 51-9; G. Miller Dep. at 27:21-23, ECF 51-12. However, the Millers supplied many essentials for Krukowski to live in the apartment, including, among other things, furniture, kitchenware, toiletries, and clothing. R. Miller Dep. at 36:19-20, 46:7-11, ECF 51-7; G. Miller Dep. at 27:6-14, ECF 51-12. Mrs. Miller also frequently brought groceries and food to the apartment to supplement Krukowski's food stamps, G. Miller Dep. at 118:9-14, ECF 51-12; Krukowski Dep. at 65:1-5, and regularly drove Krukowski to his medical appointments both when he was living at the apartment or temporarily staying at the Millers' home, G. Miller Dep. at 14:14-21, ECF 51-12.

Although the Millers testified that the apartment was "an extension" of their home, *see, e.g.*, R. Miller Dep. at 60:2-6, ECF 51-9 ("There was the ability to come and go amongst the two locations on an as-needed basis for his mental health."); G. Miller Dep. at 19:12, ECF 51-12, they placed significant restrictions on Krukowski's access to their property. To illustrate, they did not allow him to be at their home without them being present, Krukowski Dep. at 72:5-11 ("[I]t wasn't . . . a come-and-go-as-you-please type thing."); R. Miller Dep. at 18:4-11, 22:5-8, ECF 51-8, and they did not give him a key to their home nor the code to their garage, *see* R. Miller Dep. at 22:23-23:4, ECF 51-8. Krukowski stayed at the apartment for varying periods of time before the fire, spending a night, days, or sometimes weeks either there or, during bouts of depression, at the

Millers' home. *See, e.g.*, R. Miller Dep. at 26:2-12, ECF 51-8; G. Miller Dep. at 98:11-19, ECF 51-11.

Nonetheless, the Millers made clear in their depositions that keeping a separate residence, or "secondary housing," for Krukowski was essential both for his mental health and sense of independence on the one hand, and for their privacy on the other. *See, e.g.*, G. Miller Dep. at 57:9-58:1, ECF 51-11; *id.* at 54:16-17; R. Miller Dep. at 18:14-22, ECF 51-8. This was so important to the Millers that when Krukowski pleaded to move into their basement, Mrs. Miller declined, telling him that, "you can come whenever you want and stay as long as you like, but we feel it's necessary to keep the apartment." G. Miller Dep. at 43:9-44:1, ECF 51-10. The Millers insisted on Krukowski having "his own place," G. Miller Dep. at 54:16-17, ECF 51-11, because they hoped he would complete his outpatient program and live independently without their heavy involvement in his life, G. Miller Dep. at 13:1-5, ECF 51-12; R. Miller Dep. at 33:7-16, ECF 51-7.

### B. The Incident Giving Rise to the Underlying Lawsuits

On March 24, 2022, Krukowski started a fire in the apartment's bathtub, which soon engulfed the apartment and spread throughout the building, causing extensive damage to the property. ECF 51-3 at 5. Defendants Mark Manzo and 26 South State Street, LLC (collectively, "Manzo"), who owned the building, sued the Millers and Krukowski in state court, seeking to recover for the damage caused by the fire. Farmers Mutual Mot. Summ. J., Ex. R, ECF 53-20. In addition, Farmers Mutual Fire Insurance Company of Salem, as Manzo's subrogee, filed a subrogation lawsuit against the Millers and Krukowski, seeking to recover the payments it made to Manzo under its policy to repair the damage to Manzo's building. ECF 53-21. The state court consolidated those lawsuits in October 2023 and scheduled a jury trial for January 2025. ECF 51-5. However, the court stayed that case pending this declaratory action's resolution. *Id.*

## C.  The Rock Ridge Policy

The homeowner's insurance policy describes personal liability coverage as follows:

*Coverage E – Personal Liability*

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an "insured" is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

ECF 51-2 at 23.  There is no dispute that the Millers are "insureds" under the policy, and that the underlying lawsuits seek to recover for "property damage" allegedly caused by an "occurrence." The question is the scope of the coverage.

The policy contains the following exclusion at the center of this dispute:

**E. Coverage E – Personal Liability And Coverage F – Medical Payments To Others**

Coverages **E** and **F** do not apply to the following:

. . .

4. "Insured's" Premises Not An "Insured Location"

"Bodily injury" or "property damage" arising out of a premises:

   a. Owned by an "insured";
   b. *Rented to an "insured"*; or
   c. Rented to others by an "insured";

   *that is not an "insured location."*

*Id.* at 25 (emphasis added).

The policy defines "insured location," in relevant part, as:

6. "Insured location" means:

    a. The "residence premises";

    b. The part of other premises, other structures and grounds used by you as a residence; and

        1) Which is shown in the Declarations; or

        2) Which is acquired by you during the policy period for your use as a residence;

    c. Any premises *used by you in connection with* a premises described in a. and b. above.

*Id.* at 8 (emphasis added).

The exclusion set forth in Section E operates to limit coverage to a specifically defined location. For practical purposes, the dispositive issue then becomes whether the Millers used the apartment they rented for Krukowski "in connection with" their home thereby entitling them to coverage under the policy for property damage occurring at an "insured location." If so, then Rock Ridge must defend and indemnify them in the underlying lawsuits.

## II. Legal Standard

The parties agreed that the issue of coverage should be decided on cross-motions for summary judgment. ECF 49. "Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court," *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 323 (3d Cir. 2005), and the parties have not identified any material issue of fact in dispute that would necessitate a trial.

## III. Discussion

### A. Rock Ridge has no duty to defend or indemnify the Millers in the underlying cases because the exclusion for *Insured's Premises Not an Insured Location* applies.

Under Pennsylvania law, an insurer has a duty to defend if the injured party's complaint falls within the policy's coverage. *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760 (3d Cir. 1985); *accord Frog. Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999). The

insured has the burden of establishing coverage, *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 141 (3d Cir. 2023), and the insurer has the burden of proving an exclusion to coverage applies, *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206 (3d Cir. 2001). "[E]xclusions are always strictly construed against the insurer and in favor of the insured." *Cosenza*, 258 F.3d at 206-07. If an exclusion applies, the insured must "show an exception to that exclusion applies to restore coverage." *Wilson*, 57 F.4th at 141.

To determine the insurer's obligation, the court examines the complaint's factual allegations and the insurance policy's language. *State Farm Fire & Cas. Co. v. Est. of Mehlman*, 589 F.3d 105, 110 (3d Cir. 2009). The "factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." *Frog, Switch, & Mfg. Co.*, 193 F.3d at 746. If the court finds there is no duty to defend, then there is no duty to indemnify. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005).

Here, the Millers' policy provides for coverage "[i]f a claim is made or a suit is brought against an 'insured' for damages because of . . . 'property damage' caused by an 'occurrence' to which this coverage applies." ECF 51-2 at 23. However, there is no coverage for property damage "arising out of a premises" "rented to an 'insured' . . . that is not an 'insured location.'" *Id.* at 25. Relevant here, the policy defines "insured location" as "[a]ny premises *used by you in connection with* a premises described in a. and b. above." *Id.* at 8 (emphasis added).

Scant case law exists in Pennsylvania defining the term "in connection with" in insurance coverage disputes. The parties agree that in the absence of a precedential Pennsylvania Supreme Court decision, the leading case on this issue is *State Farm Fire & Cas. Co. v. MacDonald*, 850 A.2d 707 (Pa. Super. Ct. 2004), where the Pennsylvania Superior Court addressed contractual language identical to the language at issue here. There, the question was whether the homeowner's

policy excluded coverage for bodily injury arising out of ownership of a motor vehicle. *Id.* at 709. In that case, the insured kept all-terrain vehicles ("ATVs") on his property, frequently riding them on his land and across an adjacent field. *Id.* at 708. One day, the insured allowed his friend's teenage daughter and her friends to ride the ATVs, which resulted in a fatal accident on the adjacent field. *Id.*

The carrier argued that it had no duty to defend or indemnify in the underlying wrongful death action, relying on an exclusion in the homeowner's policy that precluded coverage for motor vehicle accidents occurring off an "insured location," which the policy defined to include "any premises used by you in connection with" the insured's property. *Id.* at 710. The *MacDonald* court construed the word "use" and the phrase "in connection with" based on their ordinary meanings, defining "use" as "continued or repeated exercise or employment" or "habitual or customary practice"; "connection" as "the act of connecting: a coming into or being put in contact"; and "with" as "alongside of: near to." *Id.* at 711. The court concluded that, because the insured "repeatedly rode his ATV from his property onto the adjacent field and back," he used the adjacent field in connection with his property, and therefore coverage existed. *Id.*

Judge Brody of this Court considered *MacDonald* in another ATV-accident case where a trail began approximately 800 yards from the insured's property but was still easily accessible after leaving the insured's driveway. *Allstate Ins. Co. v. Drumheller*, No. 02-cv-7411 (E.D. Pa. Mar. 17, 2005), *aff'd*, 185 Fed. App'x 152 (3d Cir. 2006).[1] She concluded that *MacDonald* turned on the fact that the insured used "the adjacent field repeatedly, and the field was adjacent to the

---

[1] These facts are set forth in Judge Brody's first opinion, after which the case was remanded for her to consider *MacDonald*, which was issued while the appeal was pending. *Allstate Ins. Co. v. Drumheller*, 285 F. Supp. 2d 605, 608 (E.D. Pa. 2003), *vacated*, 115 F. App'x 528 (3d Cir. 2004).

resident premises," No. 02-cv-7411, ECF 22 at 3, and found coverage under the policy at issue because the facts were sufficiently similar to the facts in *MacDonald*. *Id.* at 4; *accord Farmers New Century Ins. Co. v. Angerson*, No. 04-cv-2608, 2008 WL 238622, at *14 (M.D. Pa. Jan. 22, 2008) (holding that the insured's and son's repeated riding an ATV from their property into woods that were nearby but not adjacent was a use in connection with the residence premises).

The parties focus on language interpreting *MacDonald* from two non-precedential opinions issued by the Third Circuit Court of Appeals in *Drumheller*, but as I have previously held, "[t]here is little to be gained from trying to parse such decisions. As an initial matter, the Circuit itself will not cite them, because such opinions 'are not regarded as precedents that bind the court because they do not circulate to the full court before filing'. Third Circuit Internal Operating Procedure 5.7. Consequently, any purported guidance from such cases is illusory. *See United States v. James*, 928 F.3d 247, 254 n.5 (3d Cir. 2019) (disregarding the district court's discussion of two non-precedential cases because of their lack of authority); *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 212 n.1 (3d Cir. 2015) (sympathizing with the district judge who 'understandably relied' on three non-precedential opinions before reversing him, noting their non-binding status)." *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 236 (E.D. Pa. 2021) (McHugh, J.). I will therefore give no weight to the appellate discussion in *Drumheller*.

Judge Schiller of this Court analyzed *MacDonald* in *Allstate Ins. Co. v. Levell*, No. 07-cv-3790, 2008 WL 4787586, at *5 (E.D. Pa. Oct. 31, 2008), and found no coverage in a case where there was a much stronger connection between two properties than exists here. In *Levell*, the insureds owned adjacent properties that shared a driveway, residing in one, and renting out the other. *Id.* at *1. The insureds transplanted shrubs from the rental property to their residence, had their personal mail delivered to the rental property, allowed tenants to place their trash for

9

collection at the residence, regularly used the shared driveway, and one insured used the rental property address on his driver's license and car registration. *Id.* at *2, 7. A motorist was killed by a branch that fell from a tree planted on the rental property and his estate sued the owners of the two properties. *Id.* at *1. Each property was separately insured, but the owners sought liability coverage under the more expansive policy issued for their residence on the basis that they used the rental property "in connection with" the residence. *Id.* Despite joint ownership and overlapping use, Judge Schiller declined to hold that the residential policy provided coverage. *See id.* at *7-9.

Here, the apartment was almost two miles away. The Millers claim they viewed the apartment as an "extension" of their home, reasoning that they used the apartment in connection with their home in the sense that both properties played a role in Krukowski's mental health recovery—the apartment provided him with a sense of independence, and their home offered him a sense of security. But a central point of the arrangement was that the apartment was where *he* lived, and he did not have free access to the Millers' home.

Furthermore, the throughline in decisions from other courts in this district and across the country addressing similar insurance coverage disputes indicates that to come within the "in connection with" language, the insured's habitual use of the second property must be closely linked to the insured's use of their own personal residence. *See, e.g., State Farm Fire & Cas. Co. v. Bryant*, No. 05-cv-647, 2007 WL 9700899, at *3 (N.D. Ga. Mar. 8, 2007) (holding that the apartment the insured rented for his sister to live in but never visited was not used in connection with his residence premises); *see also Mass. Prop. Ins. Underwriting Ass'n v. Wynn*, 806 N.E.2d 447, 452 (Mass. App. Ct. 2004) (concluding that the term "insured location" is "limited to the residence and premises integral to its use as a residence"); *Jacquart v. State Auto Prop. & Cas. Ins. Co.*, No. 19-cv-2480, 2020 WL 7055500, at *4-5 (D. Colo. Dec. 2, 2020) (using an investment

property as "an alternative to, or instead of," the residence premises was not a use in connection with the residence premises). *Compare Nationwide Mut. Ins. Co. v. Prevatte*, 423 S.E.2d 90, 92 (N.C. Ct. App. 1992) (holding that property was used "in connection with" the residence premises where the insureds had walked and ridden their ATV over the property for years, ending each walk or ride on the residence premises).

Here, the Millers claim they used the apartment as "secondary housing" for their son, but their testimony contradicts that, because they wanted a place for him to live which was by choice not the Millers' home. Although the Millers often went to the apartment to bring Krukowski food, to check in on him, or to take him to some of his medical appointments, these uses were neither integral to, nor closely linked with, their use of their private home. Nor were they even actual uses of the apartment by the Millers. Rather, they reflect actions taken to facilitate *Krukowski's* use of the apartment, which was intended to be, and served as, his "own place." G. Miller Dep. at 54:16-17, ECF 51-11. Moreover, the Millers' relationship with the apartment appears quite limited: their visits were relatively brief, G. Miller Dep. at 10:10-16, ECF 51-12; they never stayed overnight, and did not store any of their belongings there, R. Miller Dep. at 54:15-17, ECF 51-9. Again, the "whole purpose" of renting the apartment was to ensure Krukowski had a separate place to live that was *not* the Millers' home, G. Miller Dep. at 61:14-19, ECF 51-10, which he could not go to alone, Krukowski Dep. at 72:5-11 ("[I]t wasn't . . . a come-and-go-as-you-please type thing."); R. Miller Dep. at 18:4-11, 22:5-8, ECF 51-8.

Other arguments for coverage are unpersuasive. The Millers contend that even if the apartment is not an insured location, the property damage in question did not "arise out of" the apartment where the fire occurred, because the leased premises were not the cause of the fire. They couple that with an argument that the terms "arise out of" are ambiguous and therefore

11

must be construed against the carrier to render the exclusion inapplicable.  I agree with Rock

Ridge that ample precedent undercuts this argument.  *See Madison Const. Co. v. Harleysville*

*Mut. Ins. Co.*, 735 A.2d 100 (Pa. 1999); *McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903

(Pa. 1967); *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 155 (3d Cir. 2017).

Defendants cite the "reasonable expectations" doctrine, but an insured "may not

complain that its reasonable expectations have been frustrated when the applicable policy

limitations are clear and unambiguous."  *Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*,

941 A.2d 706, 717 (Pa. Super. Ct. 2007); *see Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521

A.2d 920, 925 (Pa. 1987).  Here, the insured premises are clearly defined, and in fact, the

Millers secured a rental policy on the apartment, implicitly acknowledging that it did not fall

within their homeowner's policy.[2]

Farmers Mutual argues that Rock Ridge waived its right to decline coverage, but I see

no factual basis for that argument where Rock Ridge sent a reservation of rights letter to the

Millers within twenty eight days of their claim being presented, and seven months before the

suits in question were filed, citing the *Insured's Premises Not an Insured Location* exclusion.

It then followed up with three additional letters that again cited the exclusion.  *See State Farm*

*Fire & Cas. Co. v. Jumper*, No. 15-cv-2389, 2017 WL 839459 (M.D. Pa. Mar. 3, 2017).

Defendants also attempt to find coverage by parsing the language that provides

exceptions to certain other exclusions in the policy.  These arguments are akin to an optical

illusion, appearing to have substance until they disappear upon closer scrutiny.  Under the

structure of the policy, there is liability protection caused by an occurrence "to which this

---

[2] The limits of that policy, placed with Erie Insurance, were insufficient to cover the loss.

coverage applies." The policy then specifies various exclusions from coverage, which in some instances have exceptions. But such exceptions operate only to limit the applicability of the specific exclusion to which they apply: they do not operate to create coverage where it otherwise does not exist. Viewed in isolation, the language of an exception might appear to be applicable to the facts here. But viewed in the context of the policy structure, such language necessarily modifies only the exception to which it applies, and Defendants here have identified no appliable exception to the *Insured's Premises Not an Insured Location* exclusion. And there is no need to dwell on Defendants' arguments that this exclusion conflicts with other provisions in the policy or renders other coverage illusory, as in each instance such arguments are based on the same flawed premise about the policy's structure.

In the final analysis, extending this policy's coverage to leased premises more than two miles away would stretch the "in connection with" language to an untenable extreme. Neither logic nor precedent supports such a result. As much as I admire the Millers' loyal support of their son and sympathize with what is certainly a difficult situation for any parent, I am constrained to agree with Rock Ridge that its policy does not require it to defend and indemnify under these circumstances.

## IV.    Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment will be granted, and all cross-motions for summary judgment will be denied. An appropriate order follows.

   /s/ Gerald Austin McHugh
United States District Judge